# THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

-----------------------------------------------------------------X

**ANDREW J. STANKEVICH**, Plaintiff,
9364 Tartan View Drive
Fairfax, VA 22032-1208

    -against-

**SABINA KAPLAN** in her personal capacity,
c/o Bedford Hills Correctional Facility
247 Harris Road
Bedford Hills, New York 10507,

**MISSISSIPPI COLLEGE**
attention: President Lee Royce
200 South Capitol Street
Clinton, Mississippi 39058,

and **JOSEPH RAGLAND**
Post Office Box 77
Jackson, Mississippi 39205-0077, Defendants.

-----------------------------------------------------------------X

**PRO SE COMPLAINT**

**JURY TRIAL REQUESTED**

**CIVIL ACTION NO.**

**FILED**

**JUN - 5 2015**

**Clerk, U.S. District and
Bankruptcy Courts**

Case: 1:15-cv-00827   Jury Demand
Assigned To : Lamberth, Royce C.
Assign. Date : 6/5/2015
Description: Pro Se Gen. Civil  (F Deck)

    ANDREW J. STANKEVICH, the Plaintiff, affirms under the penalty of perjury that the

following statements are true except those made upon information and belief, which he believes

to be true.  The Plaintiff also affirms under the penalty of perjury that the annexed exhibits, to the

best of his knowledge, are true and accurate copies of the original documents.  Especially since

Mississippi College has denied access to the Plaintiff's school email account, the Plaintiff will

provide true and accurate email quotes, rather than attaching copies of emails as exhibits.

## SUBJECT MATTER, PERSONAL JURISDICTION, AND VENUE

    This action arises from federal statutes 18 U.S.C. § 1962(c) regarding Racketeering

Influenced Corrupt Organizations (RICO), and 31 U.S.C. § 3730(h)(1) regarding the False

Claims Act, which provide subject matter jurisdiction for this Court.  Section 1965(b) of RICO

provides that process may be served in "any judicial district of the United States" when required

by the "ends of justice."  Courts have held that such "nationwide service of process" provisions

also confer personal jurisdiction over a defendant in any judicial district as long as the defendant

has minimum contacts with the United States. Requesting deference to the Plaintiff's choice, the

Plaintiff requests the U.S. District Court for the District of Columbia as the venue.

## A CHRONOLOGICAL OVERVIEW OF THE ALLEGED RACKETEERING ACTS

Superintendent Sabina Kaplan operates the Bedford Hills Correctional Facility (BHCF)

through racketeering conduct, rather than following statutory law, common law, agency policy,

or regulations. As early as Spring 2010, Mississippi College's School of Law (MC Law)

fabricated evidence to discredit the Plaintiff's complaints to the American Bar Assoc. (ABA),

whose accreditation status determines which law schools receive federal funding. The Plaintiff

suspects that these two (2) distinct racketeering enterprises partnered to sabotage *Stankevich v.*

*Netburn,* a petition the Plaintiff filed in the U.S. District Court for the Southern District of New

York (¶¶ 18-27, 37), and have continued to collaborate. The Defendants' open-ended scheme

furthered a continued pattern of racketeering through interstate travel, murder, narcotics

trafficking, extortion, retaliation against a witness or victim, and witness tampering.

- **Murder** and **Witness Tampering**: Westchester County's Dr. Aleksandar Milovanovic covered-up murder in inmate Barbara Augustine's Mar. 30, 2008 autopsy report. Milovanovic excluded that Augustine was fully restrained when she allegedly removed her own life support, contradicting "self-extubation" as the cause of her death, and suggesting that hospital staff murdered Augustine through extubation. ¶¶ 59-61.

- **Witness Tampering**: in the Spring of 2010, then-MC Law Prof. Meredith Aden email falsely portrayed the Plaintiff as a 'blatant liar', in order to fabricate false evidence to mislead the ABA's official proceedings for the Plaintiff's complaints. ¶ 3.

- **Witness Tampering**: MC Law Asst. Dean John Brown attempted to intimidate the Plaintiff into not informing the ABA, the FBI, or the U.S. Dept. of Education about the rape threats the Plaintiff received in the Spring of 2010. ¶ 7.

- **Witness Tampering**:  in a Mar. 8, 2011 email, MC Law Prof. Matthew Steffey, who is not a licensed psychologist, authored a conclusory and unfair mental health evaluation without alleging corroborating facts.  ¶¶ 4-6.

- **Witness Tampering**:  fraudulently procuring mental health evaluations for the Plaintiff, Asst. Dean Brown, then-MC Law Dean James Rosenblatt, and others staged a hoax in Dec. 2011 to depict the Plaintiff as a danger to the law school, fabricating false evidence to mislead the ABA's official proceedings for the Plaintiff's complaints.  ¶¶ 9-16, 29.

- **Witness Tampering**:  preventing the Plaintiff from responding within thirty-five (35) days to an official federal appellate court proceeding, the Jackson, MS U.S.P.S. delayed a letter by around forty (40) days in early 2013, presumably on MC Law's behalf.  ¶ 54.

- **Retaliation Against a Witness or Victim**:  MC Law embezzled $5,004 in tuition from the Plaintiff for Spring 2013 classes which clearly should have been refunded.  ¶ 17.

- **Retaliation Against a Witness or Victim**:  MC Law diminished the Plaintiff's chances of obtaining a law license, through false records and fraudulent psychology, also constitutes retaliation, especially by ignoring the Plaintiff's correction requests.

- **Retaliation Against a Victim or Witness**:  in May 2013, the Plaintiff informed BHCF Supt. Kaplan that he would fly cross-country to visit inmate Joyce Powell, but Kaplan wrongfully denied the expensive May 23, 2013 visit without any warning.  ¶ 38.

- **Narcotics Trafficking, Witness Tampering**:  Dr. Aleksandar Milovanovic covered-up narcotics trafficking at BHCF in inmate Iesha Lora's June 19, 2013 autopsy report. Milovanovic never mentioned that doctors found a bag a pills, probably morphine, in Lora's vaginal cavity, withheld information that would make the circumstances of Lora's death seem very different, even benign.  ¶¶ 57-59.

- **Witness Tampering**:  coupled with a false Sept. 7, 2013 memo from BHCF's Correspondence Unit, NYS Dept. of Corrections and Community Supervision (DOCCS) Atty. Nancy Heywood's Sept. 6, 2013 letter misstated facts, while providing false information designed to create animosity between Powell and the Plaintiff.  ¶¶ 38-39.

- **Extortion Under the Color of Official Right and Interstate Travel**:  in the Fall of 2013, former MC Law Prof. Joseph Ragland extorted two payments from the Plaintiff totaling $1,000, while using interstate transportation in aid of racketeering enterprises.  ¶¶ 40-47.

- **Witness Tampering**:  after inmate Powell alleged retaliation for reporting rape, BHCF's J. Greenberg authored a Jan. 21, 2014 false memo to mislead the U.S. Government's audit for compliance with the Prison Rape Elimination Act (PREA).  ¶¶ 62.

- **Witness Tampering**: on Jan. 29, 2014, DOCCS Investigator Hotaling misinformed the Plaintiff that Ragland has had no contact with BHCF, while also allegedly lying to inmate Powell by stating that the Plaintiff accused Powell of co-conspiring with Ragland. ¶ 44.

- **Witness Tampering**: on Mar. 24, 2014, then-BHCF Records Access Officer Lewis Goidel swore to the accuracy of clearly falsified records which contradicted the Plaintiff's facts stated in pleadings for a federal court proceeding. ¶ 36.

- **Witness Tampering and Retaliation Against a Victim or Witness**: after Powell alleged that Sgt. M. Tardibuno tried to rape her, misbehavior reports resulted in Powell's placement in solitary confinement or the Special Housing Unit (SHU). Around Apr. 2014, BHCF placed Powell in the Therapeutic Behavioral Unit (TBU) to create evidence in order to mislead the U.S. Government's audit for compliance with PREA. ¶¶ 64-67.

- **Witness Tampering and Retaliation Against a Victim or Witness**: Tardibuno's clearly fraudulent July 9, 2014 misbehavior report resulted in Powell's confinement in the Separate Keeplock Unit (SKU). ¶¶ 68-70.

- **Extortion**:  Walter Boone, MC Law's Attorney, engaged in two (2) acts of extortion by ghost-writing a July 28, 2014 filing, and overtly authoring an Aug. 12, 2014 letter to intimidate the Plaintiff into dropping a civil suit seeking cash recovery. ¶¶ 31-35.

- **Witness Tampering**:  creating false evidence in response to a race discrimination complaint, DOCCS' LaShanna Frasier authored an inaccurate Oct. 15, 2014 letter. ¶ 50.

- **Witness Tampering**:  in early 2015, BHCF falsified online, public U.S.P.S records to conceal the prison staff's wrongful interference with the mail. ¶¶ 49, 55.

- **Witness Tampering and Retaliation Against a Victim or Witness**: while visiting BHCF on Feb. 7, 2015, BHCF Corrections Officers Velez and Duncan unsuccessfully conspired to trick the Plaintiff into locking himself out of his car, which would have cause a significant expense for the Plaintiff. Supt. Kaplan's Mar. 13, 2015 response shows that Kaplan lied to cover-up the C.O.'s unprofessional and abusive conduct. ¶ 52.

- **Extortion**:  on Feb. 7, 2015, C.O.'s Velez and Duncan wrongfully harassed and intimidated the Plaintiff in an unsuccessful effort to deprive the Plaintiff of his visitation and contact with Powell, an intangible, but valuable property interest. ¶ 53.

The Defendants' furthered a continued racketeering pattern by using interstate transportation in

aid of racketeering enterprises, murder, narcotics trafficking, five (5) acts of extortion, six (6)

acts of retaliation against a witness or victim, and over a dozen acts of witness tampering.

## STATEMENTS OF FACT

1.     The Plaintiff moved from New York City to enroll in the Mississippi College's School of
Law (MC Law) in the Fall of 2009, but found a hostile environment.  After a failed attempt to
transfer, the Plaintiff filed complaints with the American Bar Assoc.'s (ABA) Section of Legal
Education, who determines which law schools receive federal funding.

2.     The ABA's Mar. 8, 2011 letter determined an accreditation standard violation, in that MC
Law provided no warning of its anti-gay policies.[1]  Local television broadcast the Plaintiff's
press conference on or around Sept. 20, 2011.  As stated in letters dated June 5, 2012 and Jan.
22, 2013, the ABA did not substantively respond to the Plaintiff's Apr. 30, 2012 and Dec. 31,
2012 complaints.  The Plaintiff's Dec. 31, 2012 complaint alleged the Plaintiff's segregation, as
well as MC Law's fraudulent psychology and false records to discredit the Plaintiff.

3.     'Witness Tampering': then-Prof. Aden's email falsely portrayed the Plaintiff as a
'blatant liar', in order to fabricate false evidence to mislead the ABA's official proceedings for
the Plaintiff's complaints.  On Feb. 20, 2010, the Plaintiff emailed Aden to criticize a
presentation to the students, alleging that the presenting attorney "said something to the effect of,
'to prevent our staff from engaging in sexual misconduct, we screen on the basis of sexual
orientation.'"  In Spring of 2010, Aden emailed Asst. Dean Brown that the alleged sentence was
not in the script, accusing the Plaintiff of 'blatantly lying'.  However, while viewing a video of
the presentation during a meeting with Aden, the Plaintiff pointed out a part that matched the
quote, showing that the presenting attorneys deviated from the script to state the alleged quote.

---

[1] **Exhibit 1:** ABA's letters dated Mar. 8, 2011, June 5, 2012, Jan. 22, 2013, **and** the Sept. 20, 2011 news story.

4.      'Witness Tampering' in a Mar. 8, 2011 email to then-Dean Rosenblatt, MC Law Prof.

Matthew Steffey, authored a conclusory and unfair mental health evaluation to fabricate false

evidence to mislead the ABA's official proceedings for the Plaintiff's complaints.  Asserting that

"Andrew repeatedly makes statements that seem markedly out of touch with reality[,]" Steffey,

who is not a licensed psychologist, mentioned no such statements, nor described any explicit

conduct that "exhibits deeply concerning signs of . . . misperception[.]"  Without alleging any

supporting facts, Steffey wrote that "many of [the Plaintiff's] emails and in conversations, he

seems to think that making statements . . . does or should change the reality of a given situation".

5.      Fabricating evidence to frame the Plaintiff as a 'danger to the law school', if needed,

Steffey predicted "the following with due caution:  I have begun to think that Mr. Stankevich is

or may become a danger to himself and others."  Making such disturbing, prejudicial predictions,

without corroborating details, constitutes unprofessional and unfair behavior, the then-Dean

Rosenblatt should have discouraged.

6.      After authoring a mental health evaluation without licensure and without the Plaintiff's

knowledge, Steffey began disseminating his unfair conclusions amongst the student body.

Apparently trying to please their professor, a student had emailed Steffey to say that "I hope [the

Plaintiff] gets the [mental health] help that he needs."  Another student emailed Rosenblatt to

comment on how the former Dean had stated the Plaintiff to be "irrational."

7.      'Witness Tampering', Asst. Dean Brown attempted to intimidate the Plaintiff into not

informing the ABA, the Federal Bureau of Investigation, or the U.S. Dept. of Education about

the rape threats.  In the Spring of 2010, the Plaintiff received rape threats over the phone.  Brown

told the Plaintiff not to tell anyone else.  When the Plaintiff objected, Brown allegedly began an

investigation on Apr. 15, 2010.  In emails dated Apr. 20, 2010, May 3, 2010, and May 6, 2010,

Brown stated that he was investigating, but never shared any results with the Plaintiff.

8.       On Jun. 16, 2010, the Plaintiff emailed Assoc. Dean McIntosh,

> Brown's [first] response to my harassing phone calls . . . was to call the Hinds
> County Sheriff's Office and try to dissuade them from getting involved! I'd also
> like to see a written policy for procedure regarding student on student crime at
> MC Law. I asked Dean Brown for this well before the phone call incident, but he
> declined to do so.

The Plaintiff emailed McIntosh on Jun. 23, 2010, "MC Law should have a statement saying that

it will not take sides in such a dispute and will facilitate the law enforcement's investigation to

the best of its ability."  In an email, McIntosh refused the Plaintiff's suggestion on Jun. 23, 2010.

9.       'Witness Tampering', Asst. Dean Brown, then-Dean Rosenblatt, and others staged a hoax

in Dec. 2011 to depict the Plaintiff as a danger to the law school, fabricating false evidence to

mislead the ABA's official proceedings for the Plaintiff's complaints.  On Dec. 5, 2011, the

Plaintiff posted on Facebook (FB) that "[it would be funny if] God smites MC Law and MC

undergrad, the staff and students who deserve such, die a terrible death. Ha ha ha ha."  The

Plaintiff's post arose from faculty and students' ongoing harassment.

10.      After the Plaintiff complained about rape threats to a sheriff in Spring 2010, Asst. Dean

Brown apparently called Sgt. Lofton from the Hinds Co. Sheriff's Dept., to persuade him to

ignore the Plaintiff and not get involved.  Illustrating a double standard in Dec. 2011, MC Law

got local and federal law enforcement involved without anyone alleging any threats at all.

11.      On Dec. 5, 2011, Asst. Dean Brown served the Plaintiff with a letter stating that "[t]he

comments have caused many on both the law school campus and the main Clinton campus to

have genuine concern for their health and safety." After studying over two (2) years at MC Law

and being on the Dean's List, the Plaintiff was permanently barred from calling or entering the

campus, even barred from attending his Spring 2014 graduation ceremony.

12.      **A private Christian institution, MC is known for using fraudulent psychology**

**against their students to achieve political goals.** Recently publicized, MC suspended another

student from entering the campus, declaring Marine Combat Veteran Jeremy Ralls 'a threat to

himself and others' without adequate reason since Feb. 2015.[2] Since Ralls refused to receive

counseling from a Muslim, the media accused MC of pandering to Muslims in order to

demonstrate MC's non-discrimination on the basis of religion and ensure its federal funding.

13.      While the news stories on Ralls indicate that "suspension" occurs when MC disallows a

student from continuing course work, a punishment which MC had never imposed on the

Plaintiff. However, then-Dean Rosenblatt chose to mischaracterize the Plaintiff's distance

learning arrangement as a "suspension" to prevent the Plaintiff from obtaining a law license.

The 'character and moral fitness' inquiries that state bar associations send to law schools mostly

contain 'yes and no' questions, without soliciting additional information from the school.

However, most such 'character and moral fitness' inquiries request a further explanation if the

---

[2] **Exhibit 2:** Jeremy Ralls' stories from the Clarion-Ledger, MS News Now, Campus Reform, **and** MC's statement.

student was ever suspended, allowing Rosenblatt and MC Law to smear the Plaintiff.

14.     Consider the disparity between MC Law's Dec. 2011 conduct and the Jackson Public
Schools' policy that does not allow the Jackson Police Department (JPD) to enter its premises,
even when a school cannot contain fist-fights. Yet, MC Law had the JPD come on campus to
direct students, a task that MC Law's in-house security could have easily accomplished. As
harassment, then-Dean Rosenblatt forced the Plaintiff to take the Fall 2011 final exams under
a security guard's watch, after several FBI agents interviewed the Plaintiff at his apartment.

15.     After the JPD's on-campus presence alarmed the students, then-Dean Rosenblatt used an
online 'safety survey' results to justify segregating the Plaintiff from faculty and the other
students. On Dec. 6, 2011, an unknown party (name redacted) e-mailed Rosenblatt to say,

> the police (so I hear) were on campus today. The rumors concerning Andrew have
> begun to spread, and the student body is now well aware that there is a
> "situation." I don't recall exactly word for word what Andrew's facebook
> comment was, but the students have begun to speculate. I believe there
> speculation are much worse than what was actually said. From what I do recall,
> there were no deliberate threats made by Andrew.

In spite of MC Law's policy, which requires students facing discipline to have access to the
evidence against them, Rosenblatt never allowed the Plaintiff to review statements from the
survey, even with the names redacted. 'Witness Tampering': Rosenblatt ordered the Plaintiff to
undergo an unfair psychological examination in order to fabricate false evidence attacking the
Plaintiff's credibility, and mislead the ABA's official proceeding for the Plaintiff's complaint.

16.     Meeting with the Plaintiff on Dec. 23, 2011, Dr. Debora Munczek later admitted to have
engaged in malpractice. Decreed by the State Education Dept. for N.Y. around Oct. 22, 2013,

Munczek "on Mar. 7 and Mar. 8, 2012, reported her psychological findings . . . despite having been notified by [the Plaintiff] on February 8, 2012, that he was withdrawing his consent[.]"[3] Almost two (2) years after the Dec. 2011 meeting, the Plaintiff was first notified that **Munczek provided another Mar. 8, 2012 psychological evaluation to MC Law** by reading Munczek's disciplinary records. Still concealing the facts, now-Prof. Rosenblatt's Mar. 23, 2015 affidavit does not mention the Mar. 8, 2012 evaluation, only noting the Mar. 7, 2012 email evaluation.[4]

17.    'Retaliation Against a Victim or Witness':  MC refused to refund around $5,004 in tuition for two (2) classes that clearly should have been refunded.  In the fall 2011 semester, the Plaintiff signed up for fifteen (15) credits, but did not register for 'Business Associations', as MC Law unilaterally chose the Plaintiff's classes.  Dropping BA and another class shortly after the Spring 2012 semester began, MC Law did not refund the loan money obtained in the Plaintiff's name, while issuing the Plaintiff a failing grade for both classes.

18.    In the Summer of 2012, The Plaintiff wrote a pro-bono federal appeal, so Joyce Powell, an inmate residing at BHCF, could sign and mail the petition to the court.[5]  On Oct. 18, 2012, the Hon. Richard Arcara ordered BHCF Supt. Kaplan to reply, although "[t]he petition was signed by Powell . . . and by another person, Andrew Stankevich, who is not a licensed attorney[.]"  To ensure a timely filing, the Plaintiff also mailed a copy without inmate Powell's signature, which Arcara dismissed.  The online record shows no further filings from Powell, and Powell's appeal is still pending in the U.S. District Court for the Western District of New York (W.D.N.Y).

19.    After consulting with inmate Powell, the Plaintiff believed that Powell was in support of *Stankevich v. Netburn*, a 2nd petition.  Citing federal and constitutional law, this 2nd petition

---

[3]  **Exhibit 3:**  Dr. Debora Munczek's disciplinary record.
[4]  **Exhibit 4:**  Rosenblatt's Mar. 23, 2015 affidavit, with 'Pennywise' exhibit, **and** Munczek's Mar. 7, 2012 email.
[5]  Available on PACER; *Powell v. Kaplan*, 1:12-cv-00954-JJM and *Stankevich v. Netburn*, 12 Civ. 5473 (LAP).

requested that the court allow the Plaintiff to litigate Powell's habeas petition as a non-attorney. On Aug. 16, 2012, Loretta Preska, Chief Judge for the U.S. District Court for the Southern District of New York (S.D.N.Y.) ordered the Plaintiff to amend *Netburn* by Oct. 15, 2012.

20.     On Dec. 6, 2012, Judge Preska dismissed *Netburn* as moot, because the W.D.N.Y. had dismissed the petition without Powell's signature. Preska stated that the Plaintiff filed a habeas petition "purporting to act on [Powell's] behalf. . . . Powell then filed her own [habeas] petition . . . challenging the same 2007 conviction[.]" While Preska implied that Powell, herself, wrote a brief without the Plaintiff's assistance, Powell filed a habeas petition bearing the Plaintiff's signature, otherwise identical to the petition the Plaintiff filed without Powell's signature.

21.     The Plaintiff's dismissed judicial misconduct complaint against Preska was "filed as of the date received, April 2, 2013."[6] The following day, on Apr. 3, 2013, Preska ordered the Clerk of the Court "not to accept further filings", although *Netburn* was closed on Dec. 6, 2012. Preska stated receiving "a letter from Joy Powell stating that she was 'in complete shock' when she received the Court's order of dismissal in this action because she was unaware that Stankevich had listed her as a plaintiff in this action." Initially uploaded onto PACER, the S.D.N.Y. removed Powell's letter, yet Preska quoted these documents on Apr. 3, 2013. The record for *Netburn* notes mailing all orders from the S.D.N.Y. to the Plaintiff, except for the Apr. 3, 2013 Order, which seems to smear the Plaintiff as retaliation for his complaint.

22.     Judge Preska dismissed *Netburn* as moot because the S.D.N.Y. had no jurisdiction over the W.D.N.Y. However, Preska choose not to order *Netburn*'s transfer to the W.D.N.Y., while Preska ordered the transfer of both habeas petitions to the W.D.N.Y. Allowing inmate Powell to undercut the novice Plaintiff, the S.D.N.Y. wrongfully added Powell as a Co-Plaintiff without

---

[6] **Exhibit 5:** The Apr. 4, 2013 letter indicating receipt of the Plaintiff's judicial misconduct complaint.

her signature, even after the S.D.N.Y. had disputed the Plaintiff's standing.

23.  Possible 'Witness Tampering', BHCF may have intimidated Powell into providing false information to the S.D.N.Y. about *Netburn*. On Aug. 17, 2012, Powell stated that Kim Brown, another inmate was repeatedly **"screaming and hollering threats and insults"** at Powell, while C.O. Walton watched and refused to intervene.[7]  In a Sept. 10, 2012 grievance, Powell alleged that Sgt. Hoke abusively dismissed her Aug. 17, 2012 grievance.  The handwritten letter on the last page of the exhibit demonstrates that Powell was really afraid, and an online "Bing" search for "Joy Powell and Kim Brown" lists four (4) webpages that posted Joy's requests for help.

24.  **Suggesting 'Witness Tampering', MC Law harassed the Plaintiff regarding these official proceedings in the Summer of 2012.**  On May 4, 2012, June 4, 2012, June 8, 2012, June 11, 2012, and June 22, 2012, Assoc. Dean McIntosh's emails requested that the Plaintiff graduate by Summer 2012.  On Aug. 16, 2012, Aug. 29, 2012, and Sept. 6, 2012, McIntosh sent emails pressuring the Plaintiff not to work on the petitions filed in S.D.N.Y, but to complete the work needed to graduate in the Fall 2012 semester.  On Aug. 16, 2012, McIntosh threatened that the Plaintiff would fail the remaining classes, if he did not finish by the Fall 2012 semester.

25.  On May, 8, 2012 and June 5, 2012, Powell said that she would send letters indicating her support of *Netburn*.  On July 10, 2012, Powell stated to have sent a release form for the Plaintiff to perfect her habeas brief, and offered to send another.  On Aug. 2, 2012, Powell wrote that she could not send 3rd party mail, but that she asked the S.D.N.Y. to allow the Plaintiff to represent her and would write them again.  On Sept. 4, 2012, Powell stated gratitude for the habeas brief, later expressing support for *Netburn* and a partnership with the Plaintiff on Sept. 20, 2012.

---

[7] **Exhibit 6:** Inmate Powell's Aug. 17, 2012 grievance complaint, **and** Powell's Sept. 10, 2012 grievance.

26.     Recanting support for *Netburn* after the Plaintiff filed the amended petition in mid-Oct.

2012, inmate Powell's letters on Oct. 26, 2012, Nov. 9, 2012, and Dec. 4, 2012 seem ghost-

written by MC Law, abusively demanding that the Plaintiff take "mental meds". On Dec. 4,

2012, Powell stated that the Plaintiff should "make amends" with MC Law. Due to their

personal nature, Powell's letters to the Plaintiff were not attached as exhibits to this filing.

27.     When the Plaintiff began visiting BHCF again in early 2014, Joy refused to talk about

what had happened with *Netburn*. Exercising custody over Joy, the State of New York directly

controlled Joy's conduct that elicited a Dec. 3, 2012 letter by using tactics that violated the

Plaintiff's due process. **Upon receiving the relevant discovery materials, the Plaintiff**

**requests that the Court invite ex-parte motions for and against the Plaintiff's Dec. 3, 2012**

**letter to be clawed-back as privileged or unconstitutionally obtained.**

28.     Now-Prof. Rosenblatt's Mar. 23, 2015 affidavit likened the Plaintiff to Pennywise,

Stephen King's killer clown, in ¶ 8's quote from the Plaintiff's May 12, 2010 FB post that

ignores the adjacent Pennywise picture that states to be a movie 'fan-post'. Since outside law

enforcement did not arrive to protect MC Law from the Plaintiff, this previous post scared no

one. The subsequent Dec. 5, 2011 FB post would not have scared anyone, but for uniformed,

armed police entering the law school campus to protect the students from the Plaintiff.

29.     Probably ghost-written by Rosenblatt, Dr. Munczek's Mar. 7, 2012 evaluation stated,

"[a]lthough he does not appear to be physically violent, I cannot be certain that his words will

stop there. I have to confess that I even started to feel a bit concerned about my personal safety."

**Two (2) other psychological evaluations point to the Plaintiff's positive mental health.** On

Feb. 20, 2012, Dr. Stephen Reich swore that the Plaintiff does "not represent a threat to [myself]

or others." On Feb. 25, 2012, Dr. Gerald Bryant determined that "the test results consistently

indicated the absence of any underlying anger/hostility."

30.     Attempting to ameliorate and put in perspective his controversial Dec. 5, 2011 Facebook post, the Plaintiff's Jan. 2013 'email signature' read, "Thomas Jefferson wrote James Madison regarding Patrick Henry, after Henry had proposed a new tax in Virginia for the purpose of supporting churches. 'What we have to do, I think, is to pray devoutly for his death.'" On Jan. 8, 2013, Prof. Gordon Christy derisively emailed Assoc. Dean McIntosh, "[Andrew] is now committed to the path of prayer and will ask that God does his killing!"  On Oct. 17, 2012, the Plaintiff emailed Christy an "article that describes [my charity work] shortly before I took my LSAT's" and offered to send "copies of the 2 sworn affidavits that the psychologists issued[.]"[8]

31.     'Extortion': NYS Asst. Atty. Gen. Rebecca Kramer's July 28, 2014 filing in the NYS Court of Claims states in ¶ 9, "claimant fails to demonstrate that this expenditure was authorized by inmate Powell and that he has legal status to incur debt on her behalf[.]"[9]  Although Kramer knew that the Plaintiff was not seeking to recover damages incurred by Joy, Kramer repeatedly purported to rebut the Plaintiff's non-existent request to receive payment for Powell's damages.

32.     In ¶ 8 of the same July 28, 2014 filing, "it is unknown from reading the document whether or not inmate Powell is even aware of this Claim" or "whether [Powell] alleges that said actions have actually occurred and who [Powell] alleges is at fault." Clearly stating that Powell alleged Sgt. M. Tardibuno to be at fault, Kramer's sentence has a non-literal meaning, implicitly threatening that Powell would issue more false and humiliating statements. The July 28, 2014 motion sought to exploit the Plaintiff's previous trauma arising from *Netburn*, as a wrongful use of fear to compel the Plaintiff into conceding a claim seeking cash recovery.

---

[8] **Exhibit 7:** Newspaper article on Plaintiff, Dr. Stephen Reich's evaluation, **and** Dr. Gerald Bryant's evaluation.
[9] **Exhibit 8:** Kramer's July 28, 2014 motion. **Exhibit 9:** The Plaintiff's responding Aug. 9, 2014 cross-motion.

33.     Delivered on Aug. 12, 2014, the Plaintiff's 'cross-motion' may have unknowingly

requested sanctions against Walter Boone, MC Law's Attorney, whose knee-jerk retaliation

suggests he ghost-wrote the July 28, 2014 motion.  Without other litigation, Boone's same-day

threat to request sanctions against the Plaintiff has no other plausible explanation.[10]  Boone's

Aug. 12, 2014 letter underscores the July 28, 2014 motion's intent to intimidate.

34.     On Jan. 30, 2015, NYS Asst. Atty. Gen. Rachel Zaffrann did not deny the factual

accusation, but argued that the Plaintiff had not cited any binding rulings that would justify the

court's order for Zaffrann to disclose ghostwriting.  Replying on Feb. 4, 2015, in ¶ 2, the

Plaintiff cited Rule 3.3(b)-(c), comment 12 of the N.Y. Rules of Prof. Conduct for Atty.'s,

requiring the disclosure of ghostwriting under the circumstances.  While Zaffrann did not

substantively reply to the Plaintiff's argument, the court did not order the NYS Atty. Gen.'s

Office to disclose its ghostwriting in regards to the Plaintiff.

35.     'Extortion':  on Aug.12, 2014, MC Law Atty. Walter Boone demanded that the Plaintiff,

an unsure litigant, engage in unnecessary and impossible file retention practices or face

economic sanctions.  Boone, an experienced big law firm attorney, attempted to intimidate the

Plaintiff into withdrawing litigation seeking cash recovery.  On Aug. 12, 2014, Boone instructed

the Plaintiff to preserve any files which relate in any way to

> former students, faculty, staff, and other affiliated individuals or entities. . . .
> including emails, voicemails, text messages, instant messages, journals, blogs,
> Internet posts . . . cloud-based data and storage, temporary internet files, cookies,
> .ZIP files and all other forms of electronic information, wherever it resides . . . **If
> any of those documents are not preserved, MC Law will seek . . . the
> imposition of sanctions**. (Emphasis Added).

---

[10] **Exhibit 10**:  Boone's Aug. 12, 2014 letter (the last sentence threatens sanctions), MC Law's Oct. 31, 2012 letter,
NYS Asst. Atty. Gen. Rachel Zaffrann's Jan. 30, 2015 filing, **and** the Plaintiff's Feb. 4, 2015 filing.

In contrast to Boone's demands, on Oct. 31, 2012, MC Law alleged only maintaining emails "involving the faculty and staff" and did not maintain emails between students.

36.     'Witness Tampering': then-BHCF Records Access Officer Lewis Goidel swore on Mar. 24, 2014 that "the attached are true and exact copies[.]"[11]   However, the enclosed pages from BHCF package log listed so many wrong addresses for the Plaintiff.  Thus, the Plaintiff suspects that BHCF had previously erased all entries for the Plaintiff's packages to falsely show that the Plaintiff had no contact with inmate Powell.  Living in Fairfax, VA since Nov. 2013, the package log lists "2029B Airport" in AL for the Plaintiff's address in 2014, and Dec. 2013, as well as many earlier wrong listings.  The prison visitation log shows the Plaintiff visiting Powell on Nov. 23, 2007, but not Nov. 22, 2007, Thanksgiving Day.  Referenced in the Plaintiff's pleadings for *Netburn*, BHCF's false records undercut the Plaintiff **true** online blog (story) that revolves around the Plaintiff visiting Powell on Thanksgiving Day 2007.[12]

37.     **Powell's correspondence in the Fall of 2014 shows how BHCF's wrongful conduct caused Powell to abruptly change her mind in regards to the Plaintiff's litigation.**  On Aug. 8, 2014, Powell advised the Albany County Supreme Court "that I am in Support of the Special proceeding Mr. Stankevich has requested[.]"[13]  On Aug. 28, 2014, Powell wrote, "I just received the first five page's of your legal mail today[.]"[14]  Only providing five (5) pages from the filing, BHCF prompted Powell to write the court on Sept. 5, 2014, "[o]n 8/8/14 I sent an Affidavit to the courts in support of Stankevichs 1st petition. However . . . I was never sent a copy of the [new] petition . . . and am requesting that it would be dismissed[.]"  On Oct. 29, 2014, Powell

---

[11] **Exhibit 11:**  J. Joseph's Mar. 26, 2014 letter, Goidel's Mar. 24, 2014 certification, **and** accompanying records.
[12] The 2008 website was never updated.  See the Plaintiff's blog entry at:
     http://freejoypowell.org/articles/AmericanLiberationTheologyManifesto.html
[13] **Exhibit 12:**  Inmate Powell's letters from Aug. 8, 2014, Aug. 28, 2014, Sept. 5, 2014, **and** Oct. 29, 2014.
[14] N.Y. Correct. Law § 620 requires BHCF to "forthwith deliver" inmate legal mail.

complained about BHCF only providing five (5) pages of court filings mailed to her.

38.     'Retaliation Against a Witness or Victim' and 'Witness Tampering': BHCF waited until

the Plaintiff's arrival to deny the May 23, 2013 visit, and then created false evidence

documenting why the Plaintiff's visit was denied.[15]  On May 14, 2013, the Plaintiff's letter

informed Supt. Kaplan that he would fly cross-country to visit with inmate Powell on May 22-

24, 2013.[16]  DOCCS policy states that "an offender has a right to refuse a visit. Should this

occur [the visitor] will be notified."[17]  On May 23, 2013, BHCF notified the Plaintiff of his

negative listing, not that Powell refused the visit.  But DOCCS Atty. Nancy Heywood wrote on

Sept. 6, 2013 that Powell "indicated to staff that she did not want you to visit with her".

**Heywood's letter stated false facts to incite the Plaintiff's animosity against Powell.**

39.     Powell's Aug. 15, 2013 grievance and Sept. 12, 2013 letter to Heywood stated that she

did not deny the visit.[18]  On Sept. 7, 2013, BHCF's Correspondence Unit lied to Powell, "we

have not received any priority mail for you in the month of August 2013", but refused Priority

Mail' mailed on Aug. 23, 2013, Aug. 29, 2013, and an Aug. 22, 2013 'Media Mail' package.

40.     'Extortion' and 'Interstate Transportation', former MC Law Prof. Joseph Ragland's

emails prompted the Plaintiff to mail two $500 checks that Ragland cashed.[19]  The Sept. 11,

2013 check, in the memo line, stated to pay Ragland "to use your connection to allow Joy to get

---

[15] BHCF's conduct violates state regulations; see N.Y. Comp. Codes R. & Regs. Tit. 7 § 201.4 (2014).

[16] **Exhibit 13:**  Plaintiff's May 14, 2013 letter (# 7012 3460 0002 2015 1226), **and** Heywood's Sept. 6, 2013 letter.

[17] The NYS Department of Corrections and Community Supervision, *Handbook for the Families and Friends of NYS DOCCS Offenders*, www.doccs.ny.gov/FamilyGuide/FamilyHandbook.html (accessed Aug. 13, 2014).

[18] **Exhibit 14:**  Powell's Aug. 5, 2013 mail inquiry, BHCF Correspondence Unit's Sept. 7, 2013 reply, photo-copies of three (3) refused mailings, the Plaintiff's Aug. 12, 2013 letter to DOCCS OIG, Powell's Aug. 15, 2013 grievance complaint, **and** Powell's Sept. 12, 2013 letter to DOCCS Atty. Nancy Heywood.

[19] **Exhibit 15:**  Two (2) checks, a note that was sent with the 2nd check to Ragland, **as well as** Kaplan's Sept. 18, 2013 memo restoring the Plaintiff's visitation and mail at BHCF.

my food packages[,]" while the Sept. 30, 2013 check's memo line specified "payment for Joe Ragland's protection while visiting BHCF[.]" Supt. Kaplan restored the Plaintiff's privileges on Sept. 18, 2013. The Plaintiff emailed, "how much do I have to pay you to have a relationship with Joy? You have gotten $1,000 so far. How much more do you need?" On Oct. 14, 2014, Ragland emailed "continue sending what you desire . . . and I will . . . take action accordingly".

41.     On Oct. 23, 2013, Ragland refunded the money to avoid disciplinary action from the state bar.[20] ¶8 for Ragland's Oct. 23, 2013 affidavit stated that his discovering the checks to be 'protection payments' prompted the refund, despite his endorsing a check that stated itself to be "payment for Joe Ragland's protection[.]" Instead of a plausible, alternate explanation, much of Ragland's response to the MS Bar implies that the Plaintiff is mentally ill. Used for the cover letter to the affidavit, Ragland's stationary advertises his status as a former MC Law professor.

42.     On Oct. 6, 2013, the Plaintiff asked if Supt. Kaplan knew Ragland, but received no reply. In the same letter the Plaintiff noted that "[o]n Sept. 9, I emailed Ragland, 'OK. So what do I have to do to be able to visit Joy at Bedford Hills or send her food packages?'"[21] On Dec. 24, 2013, Goidel "neither confirm[ed] nor den[ied]" that BHCF had any records on Ragland.

43.     On Feb. 28, 2014, DOCCS Atty. Nancy Heywood wrote that then-Records Access Officer Goidel "will address your request for records 'relating to you and also reference Joseph Ragland'." On Mar. 17, 2014, Goidel stated, "[a]ny e-mails . . . [are] work product, and are exempt from disclosure." **On Apr. 22, 2014, the Plaintiff asserted that Ragland's extortion fulfilled the crime/fraud exception to the 'work product' privilege, to which Heywood and Goidel agreed.** Heywood directed BHCF on May 16, 2014 and Aug. 1, 2014 to determine if

---

[20] **Exhibit 16:** Former Prof. Ragland's Oct. 23, 2013 affidavit with same-day cover letter.

[21] **Exhibit 17:** The Plaintiff's Oct. 6, 2013 letter to Kaplan, **and** the Plaintiff's Dec. 16, 2013 letter to Goidel.

there are other e-mails. On July 16, 2014, Goidel wrote that the records "I erroneously stated as 'work product' were actually intra facility communication that was exempt from disclosure."[22]

44.     'Witness Tampering' on Jan. 29, 2014, DOCCS Inv. Hotaling informed the Plaintiff that "no such individual [Ragland] has had contact with BHCF".[23] Inmate Powell's Jan. 29, 2014 letter stated that "I was interviewed a few days ago by IG due to a letter of complaint you wrote trying to implicate me as co-conspiring with that Ragland guy." The Plaintiff never stated that Powell was at fault and did not send correspondence to the DOCCS OIG regarding Ragland. **Hotaling provided false information to incite Powell's animosity against the Plaintiff.**

45.     ¶ 4 of the Plaintiff's Jan. 13, 2015 filing rebutted NYS Asst. Atty. Gen. Sherine Cummings' ¶ 7 for a Dec. 10, 2014 filing that alleges that the Plaintiff stated to have lawfully hired Ragland, who is not licensed to practice law in N.Y.[24] Cummings dishonestly summarized to the court ¶ 13 for the Plaintiff's prior Oct. 18, 2014 filing, misstating that the Plaintiff "hired an attorney and Baptist minister, Joseph Ragland of Mississippi whom he paid $1000 to advocate on inmate Powell's behalf to get her packages and protection."

46.     From the Plaintiff's Oct. 18, 2014 motion, the last sentence for ¶ 13 reads very differently than Cummings' summary to the court: "[e]ngaging in racketeering, Ragland violated federal statutes prohibiting 'extortion under the color of official right', bribery, and 'interstate transportation in aid of racketeering enterprises', while also violating state criminal law." Receiving the Plaintiff's rebuttal to Cummings on Jan. 20, 2015, NYS Asst. Atty. Gen. Zaffrann

---

[22] **Exhibit 18:**  Five (5) letters, Feb. 28, 2014, Apr. 22, 2014, May 16, 2014, July 16, 2014, **and** Aug. 1, 2014.

[23] **Exhibit 19:**  1st page of Powell's Jan. 29, 2014 letter and Inv. Hotaling's Jan. 29, 2014 'Report of Interview'; the Plaintiff never provides to anyone his family's home phone number of (703) 425-6031, which was the phone number (land line) that Hotaling's report stated to have called.

[24] **Exhibit 20:**  the Plaintiff's Jan. 13, 2015 filing, Cummings' Dec. 10, 2014 filing **and** the Plaintiff's Oct. 18, 2014 filing.  **Exhibit 21:**  the Plaintiff's Jan. 17, 2015 filing, **and** Zaffrann's Jan. 29, 2015 filing.

frivolously reiterated that the Plaintiff stated to have hired Ragland in ¶ 7 for a Jan. 29, 2015 filing to a different judge and for different litigation. **Contradicting the NYS Atty. Gen. Office's court filings**, pg. 4 of Ragland's Oct. 23, 2013 affidavit states that Ragland thought that he was hired to advocate for an inmate **in the State of Mississippi**.          `

47.     The NYS Corrections Officers & Police Benevolent Association's (NYS COPBA) rejected the Plaintiff's payment, illustrating that the Defendants' knew that Ragland's conduct constituted extortion.  On Mar. 31, 2015, NYS COPBA stated "[i]t is unlawful to accept 'support in exchange for protection while visiting [BHCF]'", **which is exactly what Ragland did**.[25]

48.     After eleven (11) years, Rosenblatt announced his presumably pressured resignation in Nov. 2013, shortly after the Plaintiff emailed Prof. Cecile Edwards documents showing MC Law's connection to BHCF through Ragland's extortion racket.[26]  A voluntary resignation would not have been announced in the middle of the fall 2013 semester, and without a chosen successor.  Further, Rosenblatt did not retire, but continues working for MC Law as a professor.

49.     Replying to the Plaintiff's July 24, 2014 letter alleging harassment from C.O. Criner in the package room, BHCF Capt. Paul Artuz's Aug. 12, 2014 letter wrote that the package room C.O.'s "denied in writing any unprofessional conduct[.]"  Suggesting that Artuz authored his letter to create false evidence or mislead the Plaintiff, BHCF still blocked the Plaintiff's packages.  The Plaintiff made two (2) orders of hair care products and two (2) orders of typewriter ribbons on July 23, 2014 and Aug. 18, 2014.  Inmate Powell received the ribbons, but BHCF refused the hair care products, per the vendor's emails showing that a refund had been

---

[25] **Exhibit 22:** The Plaintiff's handwritten letter, **and** NYS COPBA's response with photo-copy of $200 check.
[26] Since MC Law cut-off the Plaintiff's access to his school email account pursuant to a 'litigation hold', the
          Plaintiff can only estimate that he emailed Edwards about a week before Rosenblatt's resignation.

issued for the returned products on Aug. 21, 2014 and Aug. 28, 2014.[27]

50.    'Witness Tampering' on Oct. 15, 2014, DOCCS Office of Diversity Management alleged

that their investigation did not "find any evidence to substantiate" a racial bias motivating the

misconduct.  DOCCS' LaShanna Frasier advised the Plaintiff to write the "Superintendent for

**his** determination[.]"[28] (Emphasis added).   If DOCCS had actually investigated the Plaintiff's

complaint, Frasier would have noted BHCF's female superintendent.  Postmarked on Oct. 27,

2014, the letter has two (2) signatures, suggesting that the letter was ghost-written.


51.    **Like the many ignored correction requests sent to MC Law, BHCF and DOCCS**

**refused to change clearly false records, even after the Plaintiff wrote seven (7) different**

**letters requesting correction.**  DOCCS Atty. Heywood ignored the Plaintiff's Dec. 30, 2013

request that the Sept. 6, 2013 letter be corrected.  After NYS OIG refused to investigate BHCF's

records on Oct. 7, 2014, the Plaintiff wrote DOCCS OIG on Oct. 29, 2014 regarding BHCF's

false records and received no reply.   On Nov. 2, 2014, the Plaintiff sent a letter to the state

police, copying Supt. Kaplan. N.Y. Police Inv. Bosley phoned to refer the Plaintiff to DOCCS

OIG.  A Dec. 21, 2014 letter to BHCF Dep. Supt. of Programs J. Joseph, a Jan. 25, 2015 letter to

Kaplan, and a Feb. 10, 2015 letter to Kaplan and Bosley went unaddressed.


52.    'Retaliation Against a Witness of Victim', 'Witness Tampering':  the Plaintiff's Feb. 10,

2015 letter described how C.O.'s followed the Plaintiff into the parking lot, took the Plaintiff's

keys, and harassed the Plaintiff while he visited BHCF.  In a Mar. 13, 2015 response, Supt.

Kaplan denied one (1) fact from the Feb. 10, 2015 letter, while corroborating the other related

---

[27] **Exhibit 23:**  The Plaintiff's July 24, 2014 letter to BHCF Dep. Supt. of Programs J. Joseph, BHCF Capt. Paul
           Artuz' Aug. 12, 2014 letter, six (6) emails to mail order vendors, **and** Powell's Aug. 24, 2014 letter.
[28] **Exhibit 24:**  Frasier's Oct. 15, 2014 letter, a photo-copy of the envelope postmarked Oct. 27, 2014, **as well as** the
           Plaintiff's July 24, 2014 letter to DOCCS Office of Diversity Management.

facts that the Plaintiff alleged. The Plaintiff's Mar. 25, 2015 letter re-analyzed the agreed upon facts to illustrate how the C.O.'s unsuccessfully conspired to trick the Plaintiff into locking himself out of his car, showing Kaplan to have lied in a cover-up for the C.O.'s misconduct.[29]

53.    'Extortion': C.O.'s Velez and Duncan wrongfully harassed and intimidated the Plaintiff in an unsuccessful effort to deprive the Plaintiff of his visitation with inmate Powell, an intangible, but valuable property interest to the Plaintiff. Further, the Plaintiff's Mar. 25, 2015 letter details C.O. Calhoun's abusive package room conduct.

54.    'Witness Tampering' on Aug. 1, 2012, the Plaintiff wrote the Jackson U.S.P.S. Postal Inspector to allege that the postal workers had been withholding the Plaintiff's mail. Postmarked Jan. 8, 2013, the U.S. Court of Appeals for the Second Judicial Circuit stated on Jan. 7, 2013 that they must receive a response within thirty-five (35) days. Preventing the Plaintiff's timely response, the Jackson U.S.P.S. forwarded the letter on Feb. 21, 2013, after delaying for forty (40) days, probably on MC Law's behalf.[30]

55.    **'Witness Tampering' by falsifying U.S.P.S. records to conceal that BHCF withheld a package for about a month,** the online public record for tracking mail shows that the White Plains Post Office held the package from Jan. 9, 2015, before delivery to BHCF on Feb. 6, 2015. As the internal U.S.P.S record for tracking mail shows, the Plaintiff's package for Powell was delivered to BHCF on Jan. 10, 2015. BHCF seems to have had the Jan. 10, 2015 delivery wrongfully erased from the online public U.S.P.S. record, and also erasing the Jan. 10, 2015 arrival at the Bedford Hills Post Office.[31] The internal U.S.P.S. tracking record shows that BHCF withheld the package for about a month, before BHCF returned the package to the

---

[29] **Exhibit 25:** Plaintiff's Feb. 10, 2015 letter, Kaplan's Mar. 13, 2015 letter, **and** Plaintiff's Mar. 25, 2015 letter.
[30] **Exhibit 26:** the Jan. 7, 2013 court letter and envelope, **also** an Aug. 1, 2012 U.S.P.S Postal Inspector complaint.
[31] **Exhibit 27:** the internal U.S.P.S. tracking record, package photo-copy, **and** a copy of the public tracking record.

Bedford Hills Post Office on Feb. 6, 2015, and 'refusing' the package one (1) minute later.

Contrary to the truth, the online public U.S.P.S. record shows that the package was delivered

to the Bedford Hills Post Office from the White Plains Post Office on Feb. 6, 2015.

56.     **The Plaintiff's complaints about Ragland's extortion scheme seem to have prompted**

**BHCF to retaliate against inmate Powell.**   On Nov. 25, 2013, C.O. Marcel issued Powell a

false misbehavior report "[p]er Sgt. Tardibuno [, C.O. Marcel] was informed that inmate Powell

J. was wearing altered state clothing upon my inspection I confiscated (1) pair of clearly tapered

state pants."[32]   Distinguishing male from female state-issued pants, Powell explained that NYS

manufactures female pants with tapered legs.   Powell would have had to cut both pant-legs,

remove a wedge of fabric, and then re-stitch both legs to taper her own pants.

57.     'Narcotics Trafficking':   Powell alleged in the first ¶ on page 5 for her Nov. 25, 2013

complaint that BHCF staff offer drugs to inmates in exchange for sex.   Thirty-six (36) year old

inmate Iesha Lora died on June 19, 2013 and a post-mortem drug screen found morphine in

Lora's blood and bile.[33]   In the last full ¶ on page 5 of the same complaint, Powell stated,

> Iesha Laura [sic] . . . died from a drug over dose less than nine months ago a week
> after another inmate on that same unit OD'd but was revived.   The [BHCF]
> Administration, especially Sergeant Tardibuno . . . was well aware that this
> inmate was on a suicide mission and [Lora's] death could have been prevented[.]

Lora's 'Report of Death' notes that during a full body CT scan, the doctors noticed and removed

"pills wrapped in plastic" from Lora's vaginal cavity.   Not stating any such information on the

record, no-one seems to have determined what kind of pills were found.

58.     'Witness Tampering':   Dr. Aleksandar Milovanovic's autopsy report attributed Lora's

death to pneumonia without mentioning the pills found in Lora's vagina, nor drug abuse,

---

[32] **Exhibit 28:**  Powell's Nov. 25, 2013 complaint without the 2nd page; **also** see last pg. for the misbehavior report.
[33] **Exhibit 29:**  Inmate Iesha Lora's official autopsy report.  **Exhibit 30:**  Lora's supplemental files.

showing benign circumstances for Lora's death.  In contrast, inmate Marinaq Penn's autopsy

report (M2012-1413) lists "chronic intravenous narcotism by history" as a cause of death.  In

Apr. 2011, two years before her death, Lora's unsuccessful claim apparently sought to compel

BHCF to provide Lora with Percocet, indicating Lora's known, long-time addiction.[34]

59.    The Westchester County Medical Examiner's Office maintains separate, relevant files

aside from the official autopsy report, including a one (1) page 'Report of Death'.  Usually

sending only the autopsy report, Westchester County does not provide the supplementary records

to inquiring parties unless specifically requested, sometimes withholding crucial information.

60.    'Witness Tampering' and 'Murder':  Milovanovic's autopsy report attributed Inmate

Barbara Augustine's death to "self-extubation", reiterating the hospital's report on the 2nd and

3rd page of the supplemental files.  1st page, **the Report of Death notes that Augustine**

**"pulled out her trache despite being in ankle and wrist restraints[.]"**  Seemingly disbelieving

the hospital, Milovanovic categorized the death as "unclassified", rather than a suicide.

61.    The supplementary files for the suicides of inmates Kathleen Allen (M2007-0431) and

Dana Countryman (M2010-1186) contain many pages of police investigation reports.  A checked

box at the bottom of the 2nd to last page for the supplementary files for Augustine, a document

titled "Examination of Body", indicates that no one reported to the police.[35]  On the 5th page,

notes indicate Augustine's relapse on Percocet on or around her Mar. 17, 2008 hospital

admission.  On the 2nd page, the last sentence for the July 3, 2008 notes state that Augustine's

"daughter was in contact with a lawyer regarding [Augustine's] medication."

62.    'Witness Tampering':  J. Greenfield's Jan. 21, 2014 memo fabricated false evidence to

---

[34] *Iesha Lora v. DSH Byrnes, Dr. Goldstein, and Stevens*, in the Westchester Co. Civil Sup. Ct., Index No. 321-11.

[35] **Exhibit 31:** Inmate Barbara Augustine's official autopsy report, and **Exhibit 32:** Augustine's supplemental files.

mislead the U.S. Government's audit for compliance with the Prison Rape Elimination Act

(PREA). Attributing Powell's program change to non-possession of a "Legal Research

Certificate", J. Greenfield replied to Powell's Dec. 2, 2013 allegation that her program change

constituted retaliation due to Powell's reporting rape at the law library.[36] Even though Powell

had worked at the law library for years, not all law library staff even need legal training, such as

'porters' who transport books through the facility.[37] Since BHCF trains the inmates staffing the

law library, a 'failure to have training' should not have caused Powell's removal, even if true.

63.     Since BHCF refused to provide inmate Powell with paralegal certification training, the

Plaintiff paid for such through the Blackstone Career Institute (BCI). Right before the Plaintiff

made the last payment, BHCF placed Powell in SHU and allegedly confiscated all of her legal

materials in May 2015, including the lessons that the Plaintiff had paid BCI to send to Powell.

64.     'Retaliation Against a Witness or Victim' and 'Witness Tampering': Sgt. M. Tardibuno

allegedly ordered Powell to have sex with him on Mar. 16, 2014. Due to misbehavior reports,

Powell was sentenced to the Special Housing Unit (SHU) or 'solitary confinement' around Apr.

5, 2014. False misbehavior reports on Nov. 25, 2013 from C.O. Marcel, and on July 9, 2014

from Tardibuno, as well as J. Greenfield's false Jan. 21, 2014 memo, indicate that the Mar. 2014

misbehavior reports were probably retaliation. Directive 4027A stipulates that

> [a]n initial assessment will be conducted of all inmates . . . including a
> determination of an inmate's vulnerability . . . Inmates identified as high risk with

---

[36] **Exhibit 33**: the 1st page for inmate Powell's Dec. 2, 2013 complaint, J. Greenfield's Jan. 21, 2014 memo, and two (2) pages from the Blackstone Career Institute.

[37] See Section III(F) and III(G) for DOCCS Directive 4483, *Law Libraries, Inmate Legal Assistance and Notary Public Services*, Nov. 18, 2010, www.doccs.ny.gov/Directives/4483.pdf (accessed Oct. 15, 2014).

a history of . . . vulnerability will be identified . . . and appropriate measures will
be taken to ensure that they are monitored.  Counseling services will be available
to address concerns associated with a history of sexual victimization[.][38]

The Plaintiff hired Atty. Robert Schuster.  After interviewing Powell, Schuster's Apr. 10, 2014

letter to Kaplan concluded that Joy is "in SHU under . . .  false or relatively minor allegations."

65.    A published profile unmistakably indicated inmate Powell's vulnerability to sexual

abuse, which especially arises from previous sexual victimization while incarcerated.[39]

[Powell] was one of almost 60 women who agreed to $1,000 payments from the
state after they filed a class-action suit challenging the practice of filming inmates
being strip searched.  "Prison was a reality check," Powell says.  "I went through
hell, being locked, being fondled.  It was a nightmare."

Realizing the significance, Schuster stressed to Supt. Kaplan that Powell "suffers from diagnosed

post traumatic stress disorder from being raped at the Albion Correctional Facility[.]"

66.    In an Apr. 23, 2014 email to the Plaintiff, Atty. Schuster wrote "according to the [Deputy

Superintendent of Security Roy Snyder], Joyce was doing well for several years and was moved

to the 'honor floor' but has since declined in the past year."  Since inmate Powell only left the

honor floor a month ago, Snyder's comment seems dishonest.  BHCF later moved Powell to the

Therapeutic Behavioral Unit (TBU), which "provides services to a target population of

incarcerated inmates who have a demonstrated history of treatment resistance and poor custodial

adjustment/behavior", despite Powell just leaving her long-time housing placement for well-

adjusted/behaved inmates.[40]

---

[38] See Section IV(B)(1) for DOCCS Directive 4027A, *Sexual Abuse Prevention & Intervention – Inmate-on-Inmate*, Aug. 16, 2011, www.doccs.ny.gov/Directives/4027A.pdf (accessed July 25, 2014); see also 28 C.F.R. §§ 115.21(d)-(e), 115.41(g), and 115.42(b).

[39] **Exhibit 34**: Schuster's Apr. 10, 2014 letter and fee agreement, Jim Memmott, *A Constant Call for Peace on the Streets*, Democrat and Chronicle, Nov. 26, 2002, **and** Powell's Apr. 9, 2014 complaint (last sentence).

[40] NYS Department of Corrections and Community Supervision, *Profile of Inmates Designated as Seriously Mentally Ill Under Custody January 1, 2013*, www.doccs.ny.gov/Research/Reports/2013/SMI_Offenders_Under_Custody_2012.pdf (accessed on Oct. 14, 2014).

67.     'Witness Tampering': mis-using the TBU to diminish Powell's credibility for the U.S.
Government's official proceeding to determine DOCCS' PREA compliance, BHCF also stamped
"TBU" on outgoing mail to prejudice Powell's would-be allies against her.[41]  The Westchester
Co. Community Opportunity Program stated to the Plaintiff to provide legal advocacy and
support to BHCF inmates dealing with sex abuse issues.[42]  But, the nonprofit never provided
any services to Powell, burdening the Plaintiff to hire an attorney and support Powell himself.

68.     On Apr. 9, 2014, Powell asked Supt. Kaplan to "[s]top assigning [Tardibuno] to work
anywhere I am staying."  On Apr. 10, 2014, Atty. Schuster wrote, "**[c]learly, regardless of
provability,** it would be in the best interests of all involved to separate [Powell] from [the] Sgt."
(Emphasis Added).  In an Apr. 23, 2014 letter, Kaplan ignored retaliation, called Powell a liar,
passed the buck to DOCCS OIG, and hid behind Powell's privacy, although per state law "the
superintendent shall direct the work" of all "subordinates of the facility[.]"[43]

69.     'Retaliation Against a Witness or Victim':  Tardibuno's July 9, 2014 fraudulent report
accused Inmate Powell of asking other inmates to sign "unauthorized" forms, resulting in
Powell's confinement in the Separate Keeplock Unit (SKU).[44]  Even if true, Tardibuno had not
alleged any misconduct.  Per state law, "rules shall be specific and precise giving all inmates
actual notice of the conduct prohibited[,]" and "inmates  shall not be disciplined for making . . .
demands, or requests involving a change of institutional conditions, [or] policies[.]"[45]

---

[41] **Exhibit 35:** photo-copies for inmate Powell's outgoing mail in May 2014:  five (5) envelopes stamped "TBU".
[42] See Westchester Co. Community Opportunity Program, *Victims Assistance,* www.westcop.org/victims-assistance
          (accessed May 28, 2015).
[43] N.Y. Correct. Law §§ 18(2)-(3)(2014).
[44] **Exhibit 36:**  Kaplan's Apr. 23, 2014 letter to Schuster, Tardibuno's July 9, 2014 misbehavior report, inmate
          Powell's May 18, 2015 grievance complaint, and Powell's mailed envelope stamped "SHU".
[45] N.Y. Correct. Law §§ 138(3)-(5) (2014).

70.     **Tardibuno misquoted the rules for inmate behavior to make Powell's allowed conduct grounds for punishment.** Rule 104.12 forbids "urg[ing] other inmates to participate in a work stoppage, sit-in, [or] lock-in," while the Sgt. banned "urg[ing] other inmates to participate in any action which may be detrimental". Fraudulently banning any "unauthorized activities", Tardibuno omitted "organization" from Rule 105.12's ban on "unauthorized organization activities" or gang activities[46] **Indicating facility-wide corruption,** a 'review officer' should have dismissed Tardibuno's misbehavior report for failing to state a charge, but apparently referred the report to a hearing officer, who wrongfully disciplined Powell.[47]

71.     Alleging 'Witness Tampering', inmate Powell's May 18, 2015 grievance complaint states that BHCF seized Powell's legal books, documents, and materials, wrongfully placed Powell in SHU, and is coercing Powell into conceding her constitutional right to petition the courts.

72.     **Despite the Plaintiff diligently pursuing access to records required to be released by law, the Defendants have withheld crucial records. Accordingly, Plaintiff cannot determine the nature and extent of the damages.** Further, the statute of limitations does not begin to toll until the Plaintiff has gained access to the case's crucial facts.

---

[46] N.Y. Comp. Codes R. & Regs. Tit. 7 §§ 270.2(B)(6)(iv)-(v)(2014). See Rules 105.13-14, "[a]n unauthorized organization is any gang or any organization which has not been approved[.]"

[47] N.Y. Comp. Codes R. & Regs. Tit. 7 § 251-2.2(b)-(c)(2014). Without "sufficient reason", the review and hearing officers must be lieutenants or higher, different individuals, and a hearing officer cannot have investigated the charge at hand. N.Y. Comp. Codes R. & Regs. Tit. 7 § 251-2.1, 251-2.2(f), 253.1 (2014).

### FIRST CAUSE OF ACTION

The Defendants' racketeering destroyed any positive professional reputation for the Plaintiff, and will probably prevent law licensure and limit future employment. The Plaintiff seeks to recover lost wages from the time the Plaintiff had anticipated to pass the bar exam, after graduation from MC Law in May 2012, to when the Plaintiff would have been likely to retire. The Plaintiff seeks recovery for professional fees paid to Dr. Gerald Bryant ($2,000), Dr. Matt Lee ($1,500), Atty. Robert Schuster ($7,650), and others. The Plaintiff seeks recovery for the expenses from attempting to visit BHCF in May 2013 (¶ 38), tuition paid to the Blackstone Career Institute (¶¶ 62-63), and other expenditures that the Defendant's racketeering caused.

### SECOND CAUSE OF ACTION

The Plaintiff requests recovery for all damages from retaliation for reporting MC Law's fraud. 31 U.S.C. § 3730(h)(1) authorizes the Plaintiff "shall be entitled to all relief necessary to make [the Plaintiff] whole, if [the Plaintiff] was suspended, threatened, or harassed[.]"

### THIRD CAUSE OF ACTION

The Plaintiff seeks recovery for damages arising from MC Law's breach of contract. Upon enrollment, MC Law contracted with the Plaintiff to provide a legal education, as defined by the ABA's Standards for Accredited Law Schools and was non-compliant. Thus, the Plaintiff seeks recovery for tuition paid in cash, as well as the capital and interest for student loans.

### FOURTH CAUSE OF ACTION

Also seeking non-monetary relief, the Plaintiff requests this Court's assistance in correcting false records maintained on the Plaintiff. Prior and aside from discovery, the Plaintiff requests that this Court order the Mississippi College to release the Plaintiff's medical records, especially Dr. Debora Munczek's Mar. 8, 2012 evaluation.

**WHEREFORE**, Plaintiff requests that this Court enter judgment against the Defendants awarding the Plaintiff actual damages, treble damages, attorneys' fees, litigation costs, and any other relief which the Court may deem just or proper.

## VERIFICATION

On June 5, 2015, Andrew J. Stankevich, being duly sworn, deposes and says that deponent is the Plaintiff in this action; that deponent wrote the foregoing petition; said is true to deponent's own knowledge, except as to matters therein stated to be alleged upon information and belief, and that as to those matters, deponent believes it to be true.  After a suit and 'late claim' motion in the NYS Court of Claims not adjudicated on their merits, Plaintiff certifies to have no other pending claims for cash relief.[48]  Appealing two NYS Article 78 proceedings, the Plaintiff also has pending records access litigation in LA.[49]

**On this, the _5th_ day of June 2015, before me, a notary public, the undersigned, Andrew J. Stankevich, personally appeared, known to me or reasonably proven to be the person whose name is subscribed to the within instrument, and acknowledged that he executed the same for the purposes stated herein.**

**In witness hereof, I hereunto set my hand and official seal.**

Notary Public
The Commonwealth of Virginia
Fairfax County
Commission Expires 06/30/2015
Commission # 7600079

Andrew J. Stankevich, *Pro Se*
9364 Tartan View Drive
Fairfax, VA 22032
(571) 215-3498

6/5/15

---

[48]  Claim No. 124558 and Motion No. M-85840 were both before the Hon. Terry Jane Ruderman.  The Plaintiff's motion requesting that *Stankevich v. Munczek*, Index #100153/2015 be discontinued was mailed on June 5, 2015 by certified mail #7014 2120 0003 7072 0972 to the clerk for the NY Co. Civil Sup. Court.

[49]  Index #2623/14 from the Westchester Co. Civil Sup. Ct. was assigned 2015-03929 in the App. Div. 2nd Dept.  A 'Notice of Appeal' was filed on May 26, 2015 for Index #3536/14, another Article 78 proceeding from the same court.  Seeking a writ of mandamus to grant the Plaintiff access to public records, *Stankevich v. Serpas*, 2014-CA-1352 is awaiting a decision from the State of Louisiana's Court of Appeal, Fourth Cir.